STATE OF NORTH CAROLINA v. JERRY WADE PENLEY

No. 6925SC490

(Filed 19 November 1969)

1. **Criminal Law § 15— change of venue — special venire — widespread publicity — fair trial**

In a consolidated trial for kidnapping, armed robbery, and assault with intent to commit rape, defendant's motions for a change of venue or for a special venire from another county on the ground that he could not get a fair and impartial trial in the county because of extensive publicity and public discussion of the cases, *held* addressed to the sound legal discretion of the trial court, whose ruling in denying these motions will not be disturbed on appeal where (1) the newspaper articles filed in support of the motions were not unduly inflammatory in nature, (2) the articles were published three months prior to the trial and there was no evidence of repeated or excessive publication, and (3) the prospective jurors

who had read the newspaper accounts stated that they could return an impartial verdict. G.S. 1-84, G.S. 1-85, G.S. 9-12.

**2. Criminal Law § 91— motion for continuance — change of testimony by codefendant**

In a consolidated trial for kidnapping, armed robbery, and assault with intent to commit rape, defendant's motion for a continuance on the ground that his attorneys had learned only a few days prior to the trial that the codefendant had changed his story and implicated another person, rather than defendant, as a participant in the crimes, *held* properly denied where there was no suggestion in the record that, had the continuance been granted, defendant would have been able to develop any additional evidence as to the existence or whereabouts of the other person.

**3. Criminal Law § 91— continuance — discretion of trial judge — review**

A motion for a continuance is addressed to the sound discretion of the trial judge, whose ruling thereon is subject to review only in case of manifest abuse.

**4. Criminal Law § 91— continuance — review — prejudicial error**

Whether a defendant bases his appeal upon an abuse of judicial discretion or a denial of his constitutional rights, to be entitled to a new trial because his motion to continue was not allowed he must show both error and prejudice.

**5. Attorney and Client § 6— withdrawal of attorney from the case — grounds**

An attorney of record is not at liberty to abandon his client's cause in court without (1) justifiable cause, (2) reasonable notice to the client, and (3) the permission of the court.

**6. Criminal Law §§ 67, 88— cross-examination — evidence of defendant's speech defect**

In a consolidated trial for kidnapping, armed robbery, and assault with intent to commit rape, in which one of the prosecuting witnesses testified on cross-examination that the person who got into his car talked in a normal voice and with no unusual speech mannerisms, defense counsel should not be permitted to ask the witness "if the defendant has a speech defect and talks with a speech impediment, then he is not the man that got in the car, is he," where (1) at the time the question was asked there was no evidence that defendant had a speech defect, (2) the question was argumentative in nature, (3) the record did not disclose what the witness' answer would have been, and (4) defendant was given ample opportunity later in the trial to show that defendant did have a speech defect.

**7. Criminal Law § 101; Constitutional Law § 31— right of defense counsel to interview codefendant — presence of codefendant's counsel**

Trial court's refusal to permit defendant's attorneys to interview his codefendant without the presence of the codefendant's court-appointed counsel, such request being made at a time when the codefendant had not yet been sentenced upon his pleas of guilty and was still represented by

counsel, *held* without error, since the granting of defendant's request would have been a violation of the court's duty to see that the codefendant's rights were protected.

**8. Criminal Law § 73— hearsay testimony — exclusion**

In a consolidated trial for kidnapping, armed robbery, and assault with intent to commit rape, the questioning of the State's witness on cross-examination as to what the witness' mother had told him during the course of a conversation on the night of the offense, *held* properly excluded on the ground that it called for hearsay testimony.

**9. Criminal Law §§ 43, 66— identification of defendant — photographs — admissibility**

The photographs of defendant from which the prosecuting witnesses had identified defendant as the perpetrator of the offenses charged against him, *held* properly admitted in evidence where (1) there was no evidence that the photographic identification was conducted in such manner as to be unfairly suggestive to the witnesses and (2) the court clearly instructed the jury not to consider the fact that the photographs had been in the files of the sheriff's department prior to the commission of the offenses.

**10. Criminal Law § 158— presumptions on appeal — unfairness in photographic identification**

The Court of Appeals will not presume that the photographic identification of defendant by the prosecuting witnesses was unfairly made in the absence of any evidence to that effect, and certainly not when the contention of unfairness was first made in the Court on appeal.

**11. Criminal Law § 60— evidence of fingerprints — scope of cross-examination**

In a consolidated trial for kidnapping, armed robbery, and assault with intent to commit rape, which offenses took place in an automobile owned and operated by one of the prosecuting witnesses, trial court properly refused to permit the defendant to cross-examine a deputy sheriff in an attempt to show that defendant's fingerprints had not been found on the automobile, where the deputy sheriff testified that (1) he was not a fingerprint expert, had never qualified to read fingerprints, and (2) he had no knowledge of his own as to whose fingerprints had been found on the automobile.

**12. Criminal Law §§ 36.1, 85— attacking evidence of alibi — issue of defendant's character**

In a consolidated trial for kidnapping, armed robbery, and assault with intent to commit rape, in which the defendant had not taken the stand as a witness or introduced evidence of his good character, the solicitor could properly cross-examine the defendant's witness as to whether the defendant, a married man, had been "running around" with another of defendant's witnesses who had testified to facts tending to support an alibi, where (1) the evidence was relevant to show the nature of the association the defendant had with the alibi witness and (2) the court correctly admonished the jury not to consider the evidence as a reflection upon defendant's character.

**13. Criminal Law § 85— admission of evidence competent for one purpose and incompetent for another — character of defendant**

If specific acts are relevant and competent as evidence of something other than character, they are not inadmissible because they incidentally reflect upon character.

**14. Criminal Law § 70— tape recording of defendant's speech — corroborative evidence — admissibility**

Defendant was not prejudiced by the exclusion of a tape recording made by a speech therapist in an interview with the defendant, where the tape recording was merely corroborative of the lengthy testimony of the speech therapist that defendant had a speech defect.

**15. Criminal Law § 163— broadside assignment of error to the charge**

An assignment of error to "the failure of the court to properly charge the jury on the law applicable to kidnapping, armed robbery and assault with intent to commit rape, as shown by defendant's exception No. 15," the exception referred to appearing at the end of the entire charge, is broadside and will not be considered on appeal.

**16. Kidnapping § 1; Robbery § 4; Rape § 18— sufficiency of evidence**

In a consolidated trial for kidnapping, armed robbery, and assault with intent to commit rape, there was ample evidence of every essential element of the crimes charged, and trial court properly denied defendant's motions for judgment as of nonsuit.

APPEAL by defendant from *Copeland, J.,* 21 April 1969 Session of BURKE Superior Court.

At the February 1969 Session of Burke Superior Court the grand jury returned four true bills of indictment charging the defendant with kidnapping Frank Garland, Jr., kidnapping Wilma Radford, rape of Wilma Radford, and armed robbery of Frank Garland, Jr. At the same time indictments were returned charging Terry Veit with the same offenses. All cases were docketed for trial at the 21 April 1969 Session of Burke Superior Court, at which time Terry Veit entered a plea of guilty to the two indictments charging him with kidnapping and, to the indictment charging him with armed robbery. The State thereupon took a *nol pros* with leave in the case against Terry Veit for rape. The four cases against the defendant, Jerry Wade Penley, were consolidated for trial. In connection with the indictment charging defendant with the crime of rape, the solicitor announced in open court that the State would not try defendant for rape, but would place him on trial for the lesser offense of assault with intent to commit rape. Defendant pleaded not guilty in all cases.

The State's evidence tended to show: At approximately 9:15 p.m.

on 2 January 1969 Frank Garland, Jr., and Wilma Radford, a sixteen-year-old girl, were parked in their car in an area known as Brentwood, near Morganton, N. C. Terry Veit came to the car and forced them at gun point to open the door. Veit got into the back seat and took Garland's pocketbook containing about $86.00 in cash. After Veit got in the car, a late model light blue Plymouth drove by, and Veit directed Garland to flash his lights off and on and to follow the Plymouth. Garland started following, but lost the car. After riding ten or fifteen minutes, Veit made them stop and pick up a man walking along the road near a bridge. The man was the defendant, Jerry Wade Penley. Penley got in the front seat with Garland and Miss Radford. Veit gave Penley the gun and the money, and Penley stated that he was already in trouble with the law and had to have a way to get out of town, that he had to meet someone at Linville River, and that he didn't have anything to lose by shooting them. Penley further stated that if Garland and Miss Radford would take him where he wanted to go, he wouldn't do anything to them. Penley then returned the pocketbook and money to Garland, and directed him to drive to a filling station, where Garland purchased gas. While at the service station, Penley kept the pistol pointed at Miss Radford. At Penley's direction they then drove about ten miles to the old Boy Scout Camp at Linville River. There Penley, still holding the pistol in his hand and pointing it at Garland, directed Garland to get out of the car, took back from him his pocketbook and all of his money, and locked him in the trunk of the car. Penley then raped Miss Radford in the car while Veit held the gun. Veit then gave the gun to Penley and attempted to have sexual intercourse with Miss Radford but made no penetration. Penley then released Garland from the trunk of the car and drove back to a graveyard near Glen Alpine. Penley and Veit left, after warning Garland and Miss Radford that they would be killed if they told anyone. On returning home that night Miss Radford told her mother what had happened, the matter was immediately reported to the police, and Miss Radford gave the Sheriff's Department a description of the men involved. Miss Radford was taken to the hospital where she was examined by a physician. The examination revealed facts corroborating her recital of what had occurred, and the physician testified that in his opinion she had not had sexual relations until that night immediately prior to the time he examined her.

Defendant Penley was arrested at his home about 4 a.m. on 6 January 1969, after Garland had identified a photograph of the defendant shown him by a member of the Sheriff's Department. At the time of Penley's arrest, a fully loaded pistol, identified as the weapon

used in the affair, was found on the nightstand beside his bed. Veit, who is Penley's brother-in-law, was arrested about two hours later when he came to the jail to inquire about Penley.

Evidence offered on behalf of defendant was substantially as follows: Beulah Burnette testified she had known defendant approximately sixteen months. On the night of 2 January 1969 she loaned him her 1966 blue Plymouth for his use in going to the hospital to see his sick father. On that night she picked him up at his home and drove to Gene's Drive-In where she worked and defendant left with her car at approximately 5 p.m. She next saw defendant five or ten minutes after 10 p.m., when he picked her up after she got off from work. She drove defendant to his home and let him out at his home at approximately 10:30 p.m.

Defendant's father testified that defendant had visited him in the hospital from 6 until approximately 8 p.m. on the evening of 2 January 1969.

Terry Veit, appearing as a witness for the defendant, testified in substance: His sister is defendant Penley's wife. On 2 January 1969 he went with defendant to the hospital in Beulah Burnette's car. While at the hospital he got into an argument with the defendant, as a result of which defendant hit him. After he was hit, he went to Beulah Burnette's car and took defendant's gun from the console in the car and also took defendant's coat. Veit intended to shoot defendant when he came out. When defendant didn't come out, Veit started walking and later thumbed a ride to Glen Alpine, where he saw a person by the name of James Smathers, whom he had met during the preceding summer. Veit had a conversation with Smathers and they planned to go to Brentwood to get a car, because Smathers wanted transportation to Linville Gorge. Veit and Smathers then walked toward Brentwood, where Smathers hid in a field near the Silver Creek Bridge. At the bridge Veit gave defendant's coat to Smathers because Smathers was cold. Veit then went up to Brentwood, saw the automobile with Garland and Miss Radford in it, went up to the car and stuck the pistol in and told them to open. Veit got into the car, took Garland's wallet and money, and forced them to drive away. They picked up James Smathers at the Silver Creek bridge. Smathers had the nickname of "Curley." After Smathers got in the car, they went for gas, and then Smathers told Garland to drive to Linville Gorge. Veit's testimony as to subsequent events was substantially the same as that given by the State's witnesses, except that Veit testified that it was James (Curley) Smathers, rather than the defendant, who had participated with him in com-

mitting the crimes. Veit testified that he did not know where Smathers lived and that the last time he had seen Smathers was on the night the crimes had been committed.

On cross-examination Veit admitted that after his arrest he had signed a statement implicating the defendant and that he had never told anyone that it was James Smathers, rather than the defendant who had participated, until he told the doctors at Dorothea Dix Hospital in Raleigh. Veit contended that he had at first implicated the defendant because he thought defendant had signed a statement implicating him and because the officers had promised to "let him off light."

Defendant did not testify.

The jury found defendant guilty of the two charges of kidnapping, the charge of armed robbery, and the charge of assault with intent to commit rape. From judgments imposing prison sentences, defendant appealed.

*Attorney General Robert Morgan and Staff Attorney James E. Magner for the State.*

*Dan R. Simpson and Wayne W. Martin for defendant appellant.*

PARKER, J.

[1] Before pleading to the indictments the defendant moved for a change of venue or, in the alternative, that a jury be drawn from another county. As grounds for these motions defendant asserted that because of the extensive publicity and public discussion of the cases against him, he could not get a fair and impartial trial from a jury composed of Burke County citizens. The court instructed the attorneys for defendant to reduce these motions to writing, and proceeded with the selection of the jury. In the course of examination of prospective jurors by the solicitor, the court instructed the solicitor to ask any juror if he had read about the case in some newspaper. The record indicates that three of the prospective jurors responded that they had read some newspaper article relating to the case, but each stated that he felt he could give the defendant and the State a fair and impartial trial. While the solicitor was still in process of examining the jury panel, the court recessed for the day. On the following day the attorneys for defendant filed their written motions for change of venue or for a special venire, supporting the same by affidavits of the defendant and of three citizens of Burke County and by copies of newspaper articles which had appeared in

the local newspaper at the time of defendant's arrest and preliminary hearing in January 1969. The court overruled defendant's motions, which action the defendant now assigns as error.

Defendant's motion for a change of venue and his alternative motion for a special venire from another county were addressed to the sound legal discretion of the trial court. G.S. 1-84, G.S. 1-85, G.S. 9-12; *State v. Ray,* 274 N.C. 556, 164 S.E. 2d 457; *State v. Porth,* 269 N.C. 329, 153 S.E. 2d 10; *State v. Scales,* 242 N.C. 400, 87 S.E. 2d 916; *State v. Ledbetter,* 4 N.C. App. 303, 167 S.E. 2d 68, (*cert.* denied in 275 N.C. 500). The record before us fails to disclose that the trial judge abused his discretion in denying these motions. The newspaper articles, copies of which were filed by defendant in support of his motions, contained a factual reporting of the events giving rise to the charges against defendant and, considering the nature of these events, were not unduly inflammatory in nature. These articles had been published three months prior to the date of the trial, and the record does not indicate there had been any repeated or excessive publication. Examination of the panel of prospective jurors by the solicitor revealed that only three members had read any newspaper account of the charges against defendant, and each stated that he felt he could give defendant and the State a fair and impartial trial. As was the case in *State v. Conrad,* 275 N.C. 342, 168 S.E. 2d 39, the record before us fails to show that any juror objectionable to the defendant was permitted to sit on the trial panel or that defendant exhausted his peremptory challenges before he passed the jury. The following statement by Parker, C.J., in *State v. Ray, supra,* is particularly appropriate here:

> "There is nothing in the record to show or to suggest that any of the jurors had formed an opinion in respect to the guilt or innocence of the defendant. To hold that a prospective juror was disqualified for jury service in a particular case merely because he had read of it or listened to it over television or radio would mean that in a case that was given publicity in the newspapers or on the radio and television, only the most illiterate or ignorant jurors would be qualified. That would be an absurd result."

There is no merit in this assignment of error.

[2-4] Defendant assigns as error the overruling of his motion for a continuance made on the ground that his attorneys had learned only a few days prior to the trial that his codefendant, Veit, had changed his story and implicated one James "Curley" Smathers, rather than the defendant, as a participant in the crimes. There is

no merit in this assignment of error. A motion for a continuance is addressed to the sound discretion of the trial judge, whose ruling thereon is subject to review only in case of manifest abuse. *State v. Moses,* 272 N.C. 509, 158 S.E. 2d 617. The record reveals that the defendant's attorneys had been appointed to represent him on the day of his arrest, which was some three and one-half months prior to the trial. Nothing in the record suggests that, had the continuance been granted, defendant would have been able to develop any additional evidence as to the existence or whereabouts of the James "Curley" Smathers concerning whom his codefendant testified. No abuse of the trial court's discretion is shown in the refusal to grant the continuance. Furthermore, "(w)hether a defendant bases his appeal upon an abuse of judicial discretion, or a denial of his constitutional rights, to entitle him to a new trial because his motion to continue was not allowed, he must show both error and prejudice." *State v. Moses, supra.* Here, defendant has shown neither.

[5]     Upon denial of the motion for continuance, defendant's court-appointed attorneys moved that they be allowed to withdraw from the case. There was no error in overruling this motion. An attorney of record is not at liberty to abandon his client's cause in court without (1) justifiable cause, (2) reasonable notice to the client, and (3) the permission of the court. *Smith v. Bryant,* 264 N.C. 208, 141 S.E. 2d 303. Here, no justifiable cause was shown and no prior notice had been given to the client. The court properly refused to grant the permission.

[6]     On cross-examination, the State's witness, Garland, had testified that "the person that got into the car at the bridge talked in a normal voice," and that he could recall nothing "unusual about the talk or the manner of his speech." Counsel for defendant then asked the witness: "If this man (indicating the defendant) has a speech defect and talks with a speech impediment, then he is not the man that got in the car, is he?" The solicitor's objection to the question was sustained by the court, which action defendant now assigns as error. There is no merit to this assignment of error. At the time the question was asked no evidence had been presented to the effect that the defendant had a speech defect. The question was argumentative in nature, and the record does not reveal what the witness's answer would have been had he been required to answer the question. The record does reveal that subsequently in the trial the defendant did present testimony of a speech therapist and of other witnesses to the effect that defendant did have a speech defect, and defendant was given ample opportunity to develop this fact in his

effort to inject doubt as to his identity as a perpetrator of the crimes. No prejudicial error is shown by the court's action in sustaining the solicitor's objection to the argumentative question at the time the question was asked.

[7]   Defendant next assigns as error the court's refusal to permit his attorneys to interview his codefendant, Veit, without the presence of Veit's court-appointed attorney. This assignment of error is without merit. Aside from the fact that no prejudice can be shown by virtue of the ruling complained of, since Veit's testimony could hardly have been more favorable to the defendant even had the defendant's attorneys been able to interview Veit at length and in private, there was no error in the court's ruling. At the time the request was made, Veit had pleaded guilty to three of the charges against him and the State had taken a *nol pros* with leave as to the fourth. However, Veit had not yet been sentenced and was still being represented by his court-appointed attorney, who, in open court, had advised Veit not to testify in behalf of Penley. It was the court's duty to see that Veit's rights, no less than those of the defendant, were protected. It would have been a violation of that duty for the court to have directed that defendant's attorneys should have the right to interview Veit without his attorney being present.

[8]   While cross-examining the State's witness, Garland, defendant's attorney commenced to ask a question as to what the witness's mother had told him during the course of a conversation in which the witness had told his mother that he had seen a 1966 Plymouth at Brentwood on the night in question. This evidence as to what the witness's mother may have told him on the occasion in question was clearly hearsay, and there is no merit to defendant's contention that the court committed error in excluding it. Nor is there any merit in defendant's contention that the court, by excluding this incompetent evidence, thereby expressed an opinion as to the weight of the evidence. Furthermore, the record does not disclose what the witness's answer would have been and is totally devoid of any showing that the court's action resulted in any prejudice whatsoever to the defendant.

Defendant next assigns as error the court's action in permitting the doctor who had examined Miss Radford on the night she had been raped to testify that he may have made a statement to her concerning pain. In their brief, counsel for defendant admits that the doctor's answer, allowed in evidence over objection, was not prejudicial to defendant's case, and there is no merit to their contention that by allowing in evidence this admittedly non-prejudicial testi-

mony, the defendant's rights were thereby prejudiced before the jury.

**[9, 10]**　　There is no merit to the defendant's assignment of error directed to the admission in evidence of two photographs of the defendant which had been shown to the State's witnesses, Garland and Miss Radford, and by which they had identified the defendant. While there is some question from the record as to whether these photographs were ever introduced in evidence, we treat the matter as though they were. Defendant does not contend that the photographs were not a true likeness of the defendant, or that in themselves they were of such nature that they ought not to have been shown to the witnesses for purposes of identification. While the photographs had been in the files of the Sheriff's Department before the crimes for which defendant was tried were committed, the court clearly instructed the jury that they should not consider this fact against the defendant at any stage of the trial or during their deliberation. In oral argument on appeal, defendant's attorneys contend the photographs should not have been admitted in evidence because the record is silent as to whether these were the only photographs shown by the officers to the State's witnesses while attempting to establish the identity of the persons who had committed the offenses under investigation. Although it may be possible that photographic identification be conducted in such manner as to be unfairly suggestive to the witnesses and cause them to mistakenly identify a particular suspect as the perpetrator of a crime under investigation, evidence of any such unfairness is totally lacking in the record before us. If such had occurred, defendant's attorneys had ample opportunity to develop the facts when cross-examining the State's witnesses. We cannot presume that the photographic identification was unfairly made in the absence of any evidence to that effect, and certainly not when the contention to that effect is first made in this Court on appeal.

**[11]**　　There is no merit in defendant's assignment of error directed to the court's refusal to permit cross-examination of a sheriff's deputy in an attempt to show that defendant's fingerprints had not been found on Garland's automobile. On *voir dire* the sheriff's deputy testified that he was not a fingerprint expert, had never qualified to read fingerprints, and the only information he had ever received concerning fingerprints had come to him from the S.B.I. He further testified that he had no knowledge of his own as to whose fingerprints had been found on the automobile. Under these circumstances, there was clearly no error in sustaining objections to questions directed to this witness concerning fingerprints. Furthermore, the de-

fendant subsequently in the trial called as his own witness an investigator from the S.B.I. who testified that none of the fingerprints found on Garland's car compared with defendant's prints.

**[12, 13]** Defendant assigns as error the court's overruling his objection to the solicitor's question directed to defendant's witness, Veit, on cross-examination as to whether defendant, a married man and married to Veit's sister, had been "running around" with Beulah Burnette. Defendant contends that this was error in that, since he had not taken the stand as a witness and thereby subjected himself to impeachment, and had not introduced evidence of his good character to repel the charge of a crime, the State should not be permitted to show his bad character. In the case before us, however, the evidence was not admitted for the purpose of attacking the character of the defendant, and the court correctly admonished the jury not to consider it in any way as a reflection upon his character. The evidence was entirely relevant and competent to show the nature of the association the defendant had with the witness Beulah Burnette, who had testified to facts tending to support an alibi. "If specific acts are relevant and competent as evidence of something other than character, they are not inadmissible because they incidentally reflect upon character." Stansbury, N.C. Evidence 2d, § 111, p. 254.

**[14]** Defendant next assigns as error the court's refusal to permit the introduction into evidence of a tape recording made by a speech therapist who had interviewed the defendant at the jail shortly before the trial. This evidence was offered for the purpose of corroborating the testimony of the speech therapist to the effect that the defendant had a speech defect. The record reveals that the defendant examined the speech therapist at considerable length before the jury and that she testified fully to the nature of the speech defects of the defendant. Defendant suffered no prejudicial error by the court's action in refusing admission in evidence of the tape recording which at most corroborated his witness's testimony.

**[15]** Defendant assigns as error "the failure of the court to properly charge the jury on the law applicable to kidnapping, armed robbery and assault with intent to commit rape, as shown by defendant's exception No. 15." The exception referred to appears at the end of the entire charge in the record, and apparently applies to the charge as a whole. This assignment of error is broadside and will not be considered on appeal. 1 Strong, N.C. Index 2d, Appeal and Error, § 31, p. 166.

**[16]** Defendant's assignment of error directed to the court's re-

fusal of his motions for nonsuit is also without merit. There was ample evidence of every essential element of the crimes for which he was tried.

Defendant has been represented at his trial and on this appeal by court-appointed attorneys who have been conscientious and diligent to protect his rights in all respects. The witnesses for the State positively identified him as one of the perpetrators of the crimes for which he was tried. The evidence presented on behalf of defendant was in direct contradiction to that presented by the State. Obviously the jury did not believe the defendant's witnesses, but by their verdicts found him guilty of the vicious and brutal crimes for which he was tried. There was ample evidence to support the verdicts. Defendant has had a fair trial, free from any prejudicial error.

No error.

CAMPBELL and GRAHAM, JJ., concur.