STATE OF NORTH CAROLINA v. STEPHEN LOUIS MOORE

No. 8929SC1224

(Filed 4 September 1990)

**1. Grand Jury § 3.3 (NCI3d) — purposeful selection of black foreman — no constitutional violation**

A black defendant challenging the selection of the grand jury foreman under *State v. Cofield*, 320 N.C. 297 (1987), cannot be heard to complain that his constitutional rights have been violated when the trial court purposefully selects a black foreman in an effort affirmatively to address the defendant's allegation of racial discrimination. To the extent that the second *State v. Cofield* opinion, 324 N.C. 452 (1989), might indicate a different result by its ruling that the presiding judge must consider *all* grand jurors in selecting a grand jury foreman, it is prospective only and thus not controlling in this case in which the indictment was returned in October 1987.

**Am Jur 2d, Grand Jury § 14.**

STATE v. MOORE

[100 N.C. App. 217 (1990)]

2. **Grand Jury § 3.3 (NCI3d)— appointment of black foreman— suggestion by district attorney—removal of white foreman— jury tampering not shown**

The district attorney's suggestion to the presiding superior court judge that a black individual be appointed as foreman of the grand jury which indicted defendant in order to address concerns raised by the first *Cofield* decision does not show that the judge exceeded his authority under N.C.G.S. § 15A-622(c) in removing the white foreman or that there was unlawful prosecutorial tampering with the grand jury in violation of defendant's constitutional rights.

**Am Jur 2d, Grand Jury § 14.**

3. **Constitutional Law § 60 (NCI3d)— jury selection—investigation of racial discrimination—limiting disclosure of records to previous four years**

The trial court did not deny defendant a reasonable opportunity to investigate and produce evidence of racial discrimination in the jury selection process by limiting its order compelling disclosure of jury selection records to the previous four years where the evidence showed that the county had changed its method of compiling its lists of prospective jurors at the beginning of that four-year period and, even more recently, had rewritten its computer program to improve the random selection procedure, and it appeared that defendant would be unable to make out a prima facie case of racial discrimination if he could not produce evidence of racial discrimination in the selection process or a substantial disparity in the number of blacks in the venires during that four-year period.

**Am Jur 2d, Grand Jury § 14.**

4. **Constitutional Law § 60 (NCI3d)— jury selection—racial discrimination—denial of additional expert witness assistance**

The preliminary conclusion of an expert appointed by the court to assist defendant in investigating racial discrimination in the grand and petit juries that the lists used for jury selection might not include "all categories of the population in the proportions in which they exist in the county" did not show a reasonable likelihood that blacks are systematically excluded from the jury venire, and the trial court thus did not err in the denial of defendant's motion for additional expert witness

STATE v. MOORE

[100 N.C. App. 217 (1990)]

assistance to conduct a study comparing the racial composition of the lists and census data about the racial composition of the county.

**Am Jur 2d, Grand Jury § 14.**

Judge DUNCAN dissenting.

APPEAL by defendant from Judgment of *Judge Melzer A. Morgan, Jr.*, entered 12 May 1989 in RUTHERFORD County Superior Court. Heard in the Court of Appeals 6 June 1990.

*Attorney General Lacy H. Thornburg, by Associate Attorney General Debra C. Graves, for the State.*

*Appellate Defender Malcolm Ray Hunter, Jr., by Assistant Appellate Defender Daniel R. Pollitt, for defendant appellant.*

COZORT, Judge.

Defendant appeals from his conviction of second-degree murder. The primary issue for decision on appeal is whether the trial court erred in selecting a black, upon the district attorney's recommendation, to replace a white grand jury foreman before the defendant, a black, was reindicted after his first conviction had been set aside and a new trial ordered by the North Carolina Supreme Court. We find no error.

Defendant, a black man, was convicted on 12 May 1989 in Rutherford County, by a special venire selected from McDowell County, of second-degree murder in the 1983 killing of defendant's former girlfriend, a white woman. An earlier conviction of first-degree murder was vacated by the North Carolina Supreme Court, which granted a new trial because of error in the trial court's ruling on a venue issue. *See State v. Moore*, 319 N.C. 645, 356 S.E.2d 336 (1987).

In September of 1987, prior to his second trial, defendant, both *pro se* and through counsel, filed motions to quash the indictment and the jury array on grounds of racial discrimination, to inspect jury records, and for the appointment of an expert witness. The motions to quash the indictment and to dismiss the venire were ultimately denied.

At trial, the State introduced evidence tending to show: In July 1981, Louise Tate, who supervised the adult basic education

classes at a minimum security prison in Rutherford County, became romantically involved with defendant, Stephen Louis Moore, an inmate and volunteer teacher at the prison. Defendant stayed at Tate's home when he obtained home passes and work release and, when defendant was paroled in April of 1983, they began living together. In the fall of 1983, Tate attempted to end the relationship, but defendant would not leave her alone. In October, defendant physically assaulted Tate. He continued to harass and threaten her, and Tate requested and received assistance from local law enforcement agencies, although she declined to take out a warrant. Tate changed the locks on her doors and nailed her windows shut to keep defendant out of her house. Tate and a friend, Anne Johnson, established an arrangement whereby Johnson would telephone Tate each evening at 9:30 and 11:30 to check on Tate's safety.

On 6 December 1983, Johnson called Tate at 9:30 but did not get an answer. When she called again at 11:30, Tate answered the telephone and said, "Stephen is here," in a "breathless" voice. The telephone then hit the floor and Johnson heard scuffling in the background. Johnson testified that Tate returned to the telephone and said, "I got home and he grabbed me. He won't leave." Tate then said, "Put that thing down," and told Johnson to call back in five minutes. Johnson called back and Tate, who sounded "a million miles away," asked Johnson to "talk to Stephen." Johnson yelled at defendant to get off Tate's property or she would call the police. Defendant warned her that, if she called the police, "there would be no more Louise." Johnson called Tate's landlord, Joseph Carpenter, and a deputy sheriff. Carpenter and a friend forced entry through the back door and found Tate's body lying in a pool of blood. She had been stabbed six times and shot twice. One stab wound passed through her heart and was potentially fatal. One gunshot wound entered her left temple and was fired at close range, possibly at a distance of one inch or less. Defendant fled the jurisdiction and was apprehended in North Dakota.

Defendant testified that he did not believe that Tate really wanted to end their relationship. On 6 December 1983, he went to Tate's house to talk. They argued and physically fought. He spoke briefly to Johnson on the phone but Johnson hung up on him. Tate came toward him with a kitchen knife, there was a struggle, and defendant grabbed the knife and stabbed Tate. Tate grabbed a pistol from under the bed, but defendant took it from

STATE v. MOORE

[100 N.C. App. 217 (1990)]

her and shot her twice. He then fled because he was afraid of "the Klan."

Defendant was found guilty of second-degree murder and sentenced to 50 years in prison. Defendant appealed.

By his first assignment of error, defendant contends that his conviction must be vacated because the trial court erred in denying his motions to quash the 5 October 1987 indictment based on allegations that the foreman of the grand jury was selected on the basis of race in violation of Article I, §§ 19 and 26, of the Constitution of North Carolina. In support of this assignment of error, defendant relies on *State v. Cofield*, 320 N.C. 297, 357 S.E.2d 622 (1987).

In *Cofield*, the Supreme Court held that race discrimination in the selection of a grand jury foreman was unlawful under the state and federal constitutions and that a black defendant alleging that members of his race were excluded from the grand jury foreman selection process would, if his case were proved, be entitled to have the verdict and judgment against him set aside. We find the *Cofield* opinion inapposite to the facts before us.

The record shows that the first indictment against defendant was returned on 25 February 1985 by a Rutherford County grand jury headed by a white foreman. On 7 July 1987, the North Carolina Supreme Court issued its decision in *Cofield*. In September of 1987, defendant made motions to quash the indictment based on race discrimination in the selection of the grand jury foreman. District Attorney Alan Leonard approached Superior Court Judge Lamar Gudger, informed him of defendant's motion, the *Cofield* decision, and the fact that no black individual had ever been appointed a grand jury foreman in Rutherford County. District Attorney Leonard suggested to the judge that a black grand juror be appointed as foreman. Judge Gudger agreed and replaced the current white foreman with a black individual. On 5 October 1987, the grand jury, with the black grand jury foreman, indicted defendant for the murder of Louise Tate.

[1] At a pretrial hearing held on 14 October 1987, Superior Court Judge Hollis M. Owens, Jr., ruled that the return of a new bill of indictment by a grand jury headed by a black foreman mooted defendant's objection to the indictment on that basis. The court therefore denied defendant's motion to quash the indictment. On 4 April 1989, defendant filed a *pro se* motion to quash the new

indictment on the ground that the black foreman was selected on the basis of race and in violation of statutory requirements. That motion was denied. On appeal he contends that, since a black individual was purposefully chosen as foreman and since the district attorney admitted that he contacted Judge Gudger in order to address the *Cofield* issue, the denials of his motions were erroneous as a matter of law. We do not agree. A black defendant bringing a challenge to the selection of a grand jury foreman under *Cofield* cannot be heard to complain that his constitutional rights have been violated when the trial court purposefully selects a black foreman in an effort affirmatively to address the defendant's allegations of race discrimination. The Supreme Court's second *Cofield* opinion, 324 N.C. 452, 379 S.E.2d 834 (1989), ruling that the presiding judge must consider *all* grand jurors in selecting a grand jury foreman, applies only in that case and prospectively. *See id.* at 461, 379 S.E.2d at 839. Therefore, to the extent that *Cofield* might indicate a different result in the instant case, it is not controlling.

[2]  We further reject defendant's contention that his conviction must be vacated because the district attorney's action in bringing this matter to the attention of the trial court constituted unlawful tampering with the grand jury in violation of defendant's constitutional rights, and because the removal of the white foreman did not comply with N.C. Gen. Stat. § 15A-622. We find nothing improper in the district attorney's suggesting to the presiding superior court judge that a black individual be appointed as grand jury foreman to address concerns raised by the *Cofield* decision. That fact does not suggest that Judge Gudger exceeded his authority under § 15A-622(c) or that there was unlawful prosecutorial tampering with the grand jury in violation of defendant's constitutional rights. We therefore hold that the trial court did not err in refusing to quash the indictment on those grounds. This assignment of error is overruled.

[3]  Defendant next contends that he is entitled to a new trial because the trial court erred in denying his motions to compel disclosure of jury records. The record discloses that defendant filed pretrial motions to inspect jury selection records, including source lists, master lists, jury commission minutes, and other records for the previous 27 years. The trial court ordered the Rutherford and McDowell County clerks of court to provide defendant with records for the four-year period from 1 January 1984 through December 1987. When defendant's motions to quash the indictment

and jury venire were heard at pretrial hearings held in March and May of 1988, defendant offered no evidence in support of his motions, which were denied. On appeal, defendant contends that the trial court denied him a reasonable opportunity to investigate and produce evidence of discrimination. We do not agree.

Due process of law requires that no one shall be condemned in his person or property without notice and an opportunity to be heard in his defense. *State v. Covington*, 258 N.C. 495, 500, 128 S.E.2d 822, 826 (1963). Thus, a defendant who seeks evidence in support of a motion to quash an indictment on the ground of race discrimination must be given a reasonable opportunity to investigate and produce evidence. *Id.* (quoting *State v. Perry*, 248 N.C. 334, 339, 103 S.E.2d 404, 407-08 (1958)). What is "reasonable" depends on the facts of the particular case. *Id.* To establish a prima facie case of systematic racial discrimination, a defendant generally must produce statistical evidence establishing that blacks were underrepresented on the jury and evidence that the selection procedure was not racially neutral or that, for a substantial period in the past, relatively few blacks have served on juries notwithstanding a substantial population of blacks in the county. *Cofield*, 320 N.C. at 308, 357 S.E.2d at 629 (quoting *State v. Foddrell*, 291 N.C. 546, 554, 231 S.E.2d 618, 624 (1977)).

Based on the record before this Court, we find that the trial court did not err in limiting its order compelling disclosure to the previous four years. The evidence showed that, in 1984, Rutherford County had changed its method of compiling its lists of prospective jurors and that, even more recently, the County had rewritten its computer program to improve the random selection procedure. If defendant could not produce evidence of racial discrimination in the jury selection process utilized during the most recent four years, and during the time of his indictment and trial, or evidence of a substantial disparity in the number of blacks comprising the venire during that four-year period, then he would not be able to make out a prima facie case of racial discrimination. This assignment of error is overruled.

[4] Defendant next contends that the trial court erred in denying defendant's Motion for Additional Expert Witness Assistance. The record discloses that, on 28 September 1987, defendant filed a Motion for Appointment of Expert Witness to assist in producing evidence of racial discrimination in the selection of the grand jury

that indicted him and in the selection of its foreman. By *pro se* motion, defendant also requested expert witness assistance in analyzing jury selection procedures in Rutherford and McDowell Counties. On 8 December 1987, Judge Owens issued an order appointing Gary Thomas Long, Ph.D., to study the processes used to select grand juries in Rutherford County and petit juries in McDowell County.

On 11 February 1988, Long filed an affidavit with the court in which he stated that both Rutherford and McDowell Counties use voter registration and licensed drivers lists from which lists of prospective jurors are randomly selected. The "computerized random selection procedures employed in these counties should yield a list of jurors that is a representative cross-section of the lists," but not necessarily of the populations of the counties as a whole. In his opinion, "there is a reasonable possibility that the lists used for jury selection in both McDowell and Rutherford Counties do not include all categories of the population in the proportions in which they exist in the county," and, therefore, in order to determine racial bias, he would need to make an additional study in which the racial composition of the lists would be compared to census data about the racial composition of the county. When defendant's Motion for Additional Expert Witness Assistance came on for hearing, the trial court denied the motion.

An indigent criminal defendant has a right to the assistance of an expert in the preparation of his defense if he shows a "specific necessity" for that assistance. N.C. Gen. Stat. § 7A-450(b) (1989); *State v. Moore*, 321 N.C. 327, 335, 364 S.E.2d 648, 652 (1988). A threshold showing of necessity is accomplished upon demonstration that the defendant "(1) . . . will be deprived of a fair trial without the expert assistance, or (2) there is a reasonable likelihood that it will materially assist him in the preparation of his case." *Id.* Defendant contends that he made a sufficient showing of necessity and that the denial of his motion was error entitling him to a new trial. We disagree. The jury selection procedures used in Rutherford and McDowell Counties were in accordance with statutory requirements. *See* N.C. Gen. Stat. § 9-1 (1989). The expert's preliminary conclusion that the lists used for jury selection might not include "all categories of the population in the proportions in which they exist in the county" does not show a reasonable likelihood that a further study would show that blacks are

STATE v. MOORE

[100 N.C. App. 217 (1990)]

systematically excluded from the venire. Accordingly, we overrule this assignment of error.

Defendant's last assignments of error raise questions regarding an evidentiary ruling by the trial court, a ruling on the State's challenge to a potential juror, and a portion of the charge to the jury. We have carefully reviewed these remaining assignments of error and find them to be without merit.

For the foregoing reasons, we conclude that defendant received a fair trial, free of prejudicial error.

No error.

Judge ORR concurs.

Judge DUNCAN dissents.

Judge DUNCAN dissenting.

An expert witness was appointed to study the jury-selection process in Rutherford and McDowell Counties to determine whether there existed a basis for defendant's charge of discrimination in jury selection. After he conducted a preliminary study, the expert determined that there was a "reasonable possibility" that the voter-registration and licensed-drivers lists did not include a proportional representation of all categories of the population of those counties. The expert specified that misrepresentation on the basis of race and gender was "especially likely." He concluded, however, that "additional study [was] necessary to determine this." Defendant, consequently, moved that the expert be appointed to perform the additional study. A different judge summarily denied that motion and, today, the majority summarily holds that, because the jury-selection procedure complied with statutory requirements, "[t]he expert's preliminary conclusion . . . does not show a reasonable likelihood that a further study would show that blacks are systematically excluded from the venire." Because I do not share the majority's certainty about what additional study might or might not reveal, I dissent.

The majority refrains from articulating what more this defendant could have done to make a sufficient showing of necessity for the expert's continued assistance. At the outset, Judge Owens was satisfied that defendant had adequately demonstrated the need

for a preliminary study of the jury-selection systems. With that study having shown a basis for further investigation, it is illogical to hold that defendant, at this point, has somehow failed to demonstrate a need for expert help. We are not faced here with " 'little more than undeveloped assertions that the requested assistance would be beneficial.' " *State v. Bridges*, 325 N.C. 529, 532, 385 S.E.2d 337, 338 (1989) (quoting *Caldwell v. Mississippi*, 472 U.S. 320, 323-4 n.1, 86 L. Ed. 2d 231, 236 n.1 (1985)). Rather, we have a neutral expert who is of the opinion that there is a "reasonable possibility" that certain groups are under-represented on the lists from which grand and petit juries are drawn in McDowell and Rutherford Counties. In my view, defendant should have been allowed the continued assistance of the expert and, therefore, I dissent.